The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning. We'll hear argument first in number 19-2280, Leqwd, Inc. v. L'Oreal USA, Inc., Mr. Kinnaird. And before you begin, just be aware there are a lot of issues in this case, and my guess is we're going to end up taking more than 15 minutes aside. But why don't you begin, Mr. Kinnaird, and perhaps it would be good at the outset to address the standing issue. Yes, Your Honor. May it please the court. So the rule of decision of this court in Schreiber Foods is that transfer of all patents and causes of action, moots in action unless cured prior to final judgment. The court followed the Supreme Court's Caterpillar decision, which holds at 519 U.S. 7677 that, and quote, if at the end of the day in case a jurisdictional defect remains uncured, the judgment must be vacated. So the only substantial question is whether Olaplex, Inc. can be substituted after remand and vacator and have the judgment reinstated. And Olaplex relies on the Supreme Court's precedence under Federal Rule of Civil Procedure 21, which allows... Why is it that since the transfer took place after the injunction was entered that they can't be substituted under Rule 25? Well, because the injunction has merged into the final judgment, the action is moot, and I think there's a number of precedents that if there's a pending injunction appeal and the action becomes moot, that the appeal must be dismissed. So Olaplex relies on the Supreme Court's precedence under Federal Rule of Civil Procedure 21, which allows adding or dropping parties in the interest of justice. But as the Ninth Circuit explains, Rule 21 can only be invoked to perfect jurisdiction over the original party's claims and to afford relief to the original party. It does not apply to an action that's moot, and Rule 21 does not authorize substitution, which is what would have to occur here. That case is Bain v. California Teachers Association, 891 S. 3rd, 1206, 1216 to 17. And so... If we had a situation here in which the final judgment had been entered on the date of the injunction and then the motion for substitution were made thereafter as it was here, there would be no problem under Schreiber. Do you agree with that? If the asset transfer would have had to have occurred prior to final judgment. But if the asset transfer had occurred... I'm not understanding that. If there's a final judgment and then the case is on appeal and there's a transfer of assets, substitution is appropriate, right? Substitution under Schreiber Foods, if the transfer occurred after final judgment, Schreiber Foods does not hold that that's moot. We have an argument in the subsequent appeal that discusses whether or not you need to have expanding in order to file a brief. But as far as Schreiber Foods, yes, you're correct. That if the transfer occurs after final judgment, there could be substitution. And here the transfer occurred January 2020. Is that right? Right. And the final judgment was March. March of 2020. That's when the post-trial motions were ruled on. The post-trial motions were ruled on in December. And the district court asked the parties to reconcile the verdict and its other orders and said that it would then later enter a final judgment. And since final judgment is determined based on the district court's intent that it be the last act of the case, and there were a number of matters to reconcile about. There were conflicting prejudgment interest awards because of the odd posture in which damages were awarded by the jury on different claims without any reconciliation. The district court reconciled them, but he awarded prejudgment interest on each of the claims. So the parties had to address that issue as well as conflicting parts of the opinion that at one point said. And in your view, all of, even though the only thing in front of us is an injunction, which did predate the transfer of interest, our focus should not be on that, which would come within Schreiber, but rather on later development in the district court leading to whatever the final judgment was. Yes, just with the qualification that Schreiber says that the transfer itself creates mootness, but the mootness can be cured before final judgment. But here, the transfer did not occur before the injunction, but the relevant time period is transfer before final judgment. And do any of the cases that you've cited note the distinction between an appealable injunction and a final judgment in the district court case in the context of deciding whether substitution is appropriate by a post-injunction pre-final judgment, in a post-injunction pre-final judgment transfer of interest? No, they don't, Your Honor, but we would submit that the relevant consideration is mootness of the action as a whole. And so I think for those reasons, we think that the appeal should be vacated and the judgment dismissed without prejudice to Olaplex, Inc. filing a new action so far as it can. And then, Your Honor, if there's no further questions, I'd like to turn to the concentration claim term, which does not permit the- on the standing issue. You argue that in a situation-let's forget about an injunction situation. Let's assume that there were a transfer of assets followed by a final judgment, and the effort was to have a substitution while the case is on appeal. And your argument is that you can't substitute while the case is on appeal because it's already become moot in the district court. But what-is there a remedy under those circumstances? No, there's- What is that? Laquid argues that the remedy should be to vacate the judgment and allow the district court to consider a substitution at the district court level and then enter a new final judgment. Why is that impermissible? Well, Your Honor, that's what I was mentioning with the Bain case. All of the precedents in which Olaplex relies, Mulaney, and Newman Green, and so forth, all involve federal rule of civil procedure 21, which allows adding or dropping parties in the interest of justice, and appellate courts can do that as well. But as the Ninth Circuit explains, and also the Second Circuit itself, you cannot have substitution under rule 21. It's adding or dropping parties, for example, to restore complete diversity or, in the Mulaney case, to have the principal as well as the union with associational standing. Those are the kind of things that rule 21 can do because it's adding or dropping a party. But the only reason that the courts do that, and they say it's sparing, is that rule 21 allows you to perfect jurisdiction over the original party's claims to afford release to the original party, which means the original party still has to have Article III standing. And that's why the Ninth Circuit in Bain said those precedents don't apply when there's mootness. And Shriver Foods clearly says there's mootness unless it's cured before final judgment. So turning to the concentration claim term, that does not permit the district court's construction. A concentration is not any ratio of weights, but the ratio of a part to a whole. Thus, the concentration of active agent, quote, in the mixture, necessarily refers to the active agent that is part of the mixture. All the intrinsic evidence, particularly Specification Column 16 in the prosecution history, confirms the text. So interpreting weight of the agent in the mixture as weight added into the active agent formulation is a rewriting of claims, not a construction. Mr. Knarp, this is Judge Taranto. Suppose I thought that the language of the claim in the mixture language was actually not entirely clear, and also thought that the specification uses had the same lack of complete clarity that the language on its face does. Then why isn't this a case for reliance under a clear error deference TEVA standard to the magistrate's reliance on the express testimony of the plaintiff's expert that a person of skill in the art would understand the usage in the art, in the field of this in-the-mixture language as referring to the weight of what you put into it, not the weight of the thing that remains after the chemicals do their work once it's in the mixture? Well, if you reject our plain language argument, and I do think it's strong, I think the other point is that the construction has to be reconcilable with the 419's claim of malleic acid salts as the active agent. So malleic acid will completely ionize into salt in an aqueous alkaline bleaching mixture. Can I ask you a factual aspect of that, and maybe the other side is the better one to ask? I know that you had a sentence in your, I think it's your brief, that said if you have a small amount of malleic acid in the heavily alkaline mixture, then that amount would be completely neutralized. What if the percent of the malleic acid was at the north end of 50 percent? Do we know that all of it would be neutralized? I believe it is a function of the pH, and you can see the fractional composition chart at Appendix 24099, so I think it's understood that within the range it would all ionize, and that supports our construction. Because if a 100-gram mixture has zero grams of free malleic acid and 20 grams of malleate salts, any skilled artisan would say the concentration of salts in the mixture is 20 percent. But under the quartz construction, the answer is zero or indeterminate, and that's absurd. So Olaplex must be held to what it claimed. It may have really intended at some level to say the ratio of the pre-mixture weight to the final mixture weight or something like that, but that's not what it said. And, Your Honor, I just wanted to touch quickly on the summary judgment. We'll give you some more time. Okay. So are there any more questions? Hold on a second. Are there any more questions about the construction issue? No. Hearing none, why don't you help us assume that you're wrong for the moment on the construction as to why there are still infringement issues that weren't appropriate for summary judgment? Yes, Your Honor, and do you want me to – I was going to begin with the claims that are currently standing, unless Your Honor wants me to start with the malleic acid, because the only claims that the PTAB upheld subject to this court's review are claims – I'm sorry. They're all currently standing right now. Well, that's right. I mean, the PTAB has declared them unpatentable, but that's not final and effective until this court's review is complete. But in claims 14 to 16 of the 954 patent, the claims' breakage reductions must come from a single performance of only the claim method steps. And for this reason, our expert opines that the prototype testing on which Olaplex relies failed to prove infringement. The testing calculates breakage after three applications, as well as additional unclaimed conditioning steps. Multiple bond-building treatments will reduce breakage more than one treatment. And the report itself also said that any treatment that reduces snags, entanglements, and abrasion can help in substantially lowering the number of broken fibers, so an additional unclaimed conditioning step would destroy the results. Olaplex could have but did not commission industry standard testing to replicate only the steps of the claim method and assess breakage after one application. The expert testimony on the inadequacy of the prototype testing creates a jury question as to infringement. Further, for all claims that require use of Step 3 products, that's 12 to 16 and 19 to 20, Olaplex did not prove attribution of all method steps to a single actor as a matter of law. So stylists use Step 1 and 2, consumers Step 3. L'Oreal provides instructions on the Step 3 label, but it does not control how a consumer applies a product. And there's no evidence that L'Oreal induces any stylist to use Step 3 in the salon, so there can't be indirect infringement. Can I ask you this? So I think you'll just have to correct me if I'm wrong, but in Travel Sentry, we elaborated a little bit on what's already in the Akamai formulation, and at least the way that I think I'm reading it is control is an alternative to the first actor benefiting from the second actor's performance in some way. If that is an alternative way to satisfy the attribution standard, why is that not present here? Your Honor, what Travel Sentry says is that it's actually the control and benefit test is the alternative to the first actor performing all steps of the infringement. So what you would have to show is that the second actor was under the direction or control of the first actor. And the court's decisions in Eli Lilly and Akamai and Travel Sentry all say that it's not enough to have just product instructions, but you have to actually deny any benefit to the second actor, the consumer here, of using the product if it doesn't perform your instructions. So an example, Eli Lilly, you wouldn't get the treatment if you didn't follow the doctor's instructions. Limelight, you wouldn't have access to the computer service unless you followed the instructions. And in Travel Sentry, you wouldn't have the benefit of the security screening unless you followed the exact instructions. And that would begin with a denied summary judgment. So here it's a question of is it conclusive proof? And the answer is no. So all the instructions say for step three, for example, is leave it on for 10 minutes, towel-dry your hair first, apply it at home. So the consumers still have benefit if they did it for 11 minutes or if they air-dried their hair. So all we're doing is providing instructions. There's really no question that there shouldn't even be a genuine issue. A fact is to control, but at a minimum, there can't be summary judgment. The next thing I'd like to point out is that summary judgment has to be vacated as the indirect infringement. And the reason is that L'Oreal is entitled to reasonable inferences in its favor on each individual claim. Olaplex, as the move-in, can get necessary inferences, but there's never a necessary inference that any stylist used a given product for the claim bleaching as opposed to the non-infringing uses, such as hair coloring, which were also instructed. So to illustrate, if Olaplex had sued a stylist for direct infringement and L'Oreal for inducement, it could not get summary judgment against the stylist just by proving product instructions because there's no necessary infringement of infringing use or inference of infringing use. And thus, L'Oreal's indirect infringement is also unproven, and that applies across the board on all claims. So Olaplex did not prove a single instance of indirect infringement, but if it had, most of that would justify partial summary judgment. The district court's plenary grant of summary judgment on all indirect infringement claims completely skewed the jury trial. And this is important because, unlike reasonable royalty, this court's precedent and golden blunts in other cases say not enough to prove a single instance of direct infringement to get lost profits. You have to prove each infringing act that you claim resulted in a lost sale. And what this means is that Olaplex was deprived, relieved rather, of its liability burden at trial to prove that an induced infringing act caused every lost sale. That sounds like a damages issue for the next case rather than an issue that relates to the injunction. It's not, Your Honor. And the reason is that might be true if it were a reasonable royalty case like Lucent because in reasonable royalty, you just have to prove a single act. The royalty is determined at the date of first infringement. And Lucent says, well, if you don't prove any other infringement, you might not get much of a royalty. But this court has been clear, you know, if you're trying to get lost profits, and they claim lost profits from every single sale. So what the court has said, you have to prove that there's an infringing act that resulted in each particular lost sale, which means you have to prove and it has to be induced because this is indirect infringement of a method claim. So you have to prove that. And it's possible they could have done that by having, depending on what the evidence they put in, but it would have to be a survey of L'Oreal customers during the period based on, you know, what percentage of the stylists used it for lightening versus coloring and what was the breakdown of that stylist's usage. Am I right in understanding that the indirect infringement claims are all about what non-L'Oreal stylists do, that there's a set of L'Oreal stylists who are themselves part of L'Oreal? There may be. There was no proof put on specific to them, Your Honor. So the induced infringement, you know, the vast majority would be for stylists that are not L'Oreal. So you'd have to induce that infringement. And certainly that's the – my point is whatever the breakdown would be, they can't get plenary summary judgment on the entirety of their claims because inferences can't – inferences are drawn on each cause of action, which is each separate use. So at least a summary judgment, there's no necessary inference that everybody used it for bleaching and bleaching in compliance with the method. So they really had a failure proof. All they did is really prove the possibility that one could use L'Oreal's products to infringe. But when a product is not necessarily infringing, their burden is to prove a specific instance of infringement with a single actor performing each method step. And they just didn't bother to do that. I would note they did try, after their summary judgment motion, they put in with their opposition brief for the first time a declaration of one stylist. But we point out that's defective because there's no – that she didn't testify as to when she used it. And that's important here because the products were launched prior to the issue dates of the patent. So you have to establish that, and that inference goes in our favor. Her testimony is also completely incredible because she said she used Step 3 products in the salon. So we're entitled – you can't just accept that. That is evidence of credibility. That doesn't make it completely incredible. It just might make it a triable issue. Exactly, a triable issue on that point. And that would be for Step 1, 2, and 3. But there's, as I mentioned, an additional argument as to Step 3 because we don't induce sales, and this is undisputed. And you can see this at 449, 450. These Step 3 products are retail products sold to the consumer specifically and expressly for at-home use. So there's no evidence at all that we would induce a stylist to engage in use. Can I ask you about one of the specific non-infringement summary judgment issues that you have not either discussed or adverted to today but is I think actually the first such issue in your brief, And that has to do with whether if the district court's claim construction about the molecular weight in the range in the mixture is right, then nevertheless there was at least a triable issue of whether that claim element was met in the accused products. And you focus on how the expert for the plaintiff relied on certain results from nuclear magnetic resonance. Yes. And this is how I understand what you have said, and you can correct me, that everybody agrees that that NMR test picks up not just maleic acid but the two forms of malleates, you know, one negative and two negatives. And therefore you can't just take that as a measurement. And I guess my question is this. Did you say that would change the numbers but it would change the numbers in a way that would affect coming into or going out of the range? Because as I understand it, there's a truly trivial difference in the molecular weight between the malleates and the acid, like the difference between 116 and 114. And that just couldn't possibly change the numbers that the plaintiff's expert came up with. I mean, it would change them slightly but not either go below the south end or go above the north end of the range. Your Honor, I think it's not a question of the molecular weight as much as it is in terms of the concentration. And this is a little bit complicated, so let me just take a moment. Our point is that on concentration, Olaplex's proof did not match the district court's construction, which calculates concentration based on the weight of free malleic acid added into the activation formulation. But their expert said, and I don't think this is disputed, that any of the malleates that would show up in the NMR would come on a one-for-one basis from a malleic acid put in. So the only thing you would do to the numbers from the NMR is change the 114 grams into a 116 grams. I mean, is that right? And if that's right, then how could that possibly change the only conclusion that matters, which is that the figures that the plaintiff's expert came up with stay within the range? Your Honor, I don't believe that the expert said that, and Mr. Weisburst can point to the record if he says otherwise. Olaplex argued that in its brief when it realized the mistake that Dr. Freeman pointed out. So here's the key. The active agent formulations here are the step one products. So for purposes of claim construction, what is germane is the raw material added into those formulations, and that is an aqueous solution of malleic acid. So what Olaplex had to determine is the amount of free non-ionic malleic acid in that aqueous solution, and it did not. And, in fact, both Olaplex at page 31, note 12, and Dr. Borish in the chart at appendix 24.099 admit that even highly acidic solutions may only be partially non-ionic malleic acid, and the fractional share drops precipitously as pH increases above one. But rather than determine the free malleic acid in the aqueous solution that was added into the active agent formulation, the step one bottle, curiously Dr. Borish attempted to calculate with NMR results the free malleic acid in the step one bottles themselves. And he treated that as a proxy for what was added, and that's wrong because Dr. Freeman demonstrated that the NMR results, as you mentioned, do not distinguish free acids from malleates, and that if you actually calculate the free acid amounts in the step one bottles, the concentrations are well below the lower... Right, but I don't mean to be the dead horse, but let me beat it one more time. If it's right that the only thing that would come up in the NMR test of the stuff in the bottle that isn't malleic acid are the malleates, and if it's also right that all the malleates come from malleic acid that was in the aqueous solution before you put it into the bottle, then the question of how much difference that makes in terms of the concentration turns on the molecular weight difference, doesn't it? And that's trivial. No, Your Honor, because it's not true and there's no testimony. It's not that it just has to come from some form of malleic acid. It has to come from the free acid in the aqueous raw material solution, and that's what's never calculated, and that's what the chart at 24,099 would show, that your highly acidic solution like that is only going to have a fractional part of free acid. That's just their construction. Now, they run from their construction. Page 32 of the brief say, oh, we should just treat it as, you know, at some point, maybe at the vendor, at a vendor's plant, it came from pure malleic acid. There's no testimony to that effect, but that's what you look to somewhere down the line. What was the pure malleic acid that's put in there? And that's not the question. The question is how much free acid is in the aqueous solution, and that's just unproven, and Dr. Freeman showed that Dr. Boris's proxy approach, where he relied on the step one bottle acid, that, you know, that doesn't work. And I would also – they try now to also say, well, what about the safety sheets? I think unless there are further questions from my colleagues, I think we're about out of time. Hearing no further questions, we'll give you your three minutes for rebuttal, and we'll hear from Mr. Weisburst. Thank you, Your Honor. May it please the court, Sanford Weisburst for Liquid and Olaplex. I'd like to begin with the standing issue, and I think that the only issue that this court needs to reach in the context of this permanent injunction appeal is the one that was noted, I believe, by Judge Taranto, which is that undisputably the transfer of interest here occurred after the permanent injunction and after the notice of appeal was filed. L'Oreal has cited no case law for the proposition that somehow subsequent events regarding a final money judgment could affect standing to appeal the permanent injunction or to make the case entirely moot. Given the lack of case law, I think it's worth just putting this in some practical terms, because really this court is deciding that issue, which was not decided by Schreiber in any sense, on a clean slate. And this is a hyper-technical argument that L'Oreal is making that would lead to needless waste in terms of a remand to the district court to sort out whether to join or substitute Olaplex, Inc. Okay, but your assumption there is that that's the remedy, and they say it's not. What case says that if there's an error in entering a final judgment when the remaining party in the case lacks standing, that that can be cured by a remand to the district court to add the party and enter a new final judgment? What case stands for that proposition? So the first case I would point to, which is also cited in the briefs, is the Mulaney case in the U.S. Supreme Court. And I respectfully disagree with my friend on the other side on that question, because in Mulaney, when this case got to the U.S. Supreme Court, there was a question of whether the party had standing at all. And what the Supreme Court said is, in order to avoid having to deal with that issue, we're just going to add, for the first time in the U.S. Supreme Court, we're going to add a party that indisputably has standing. And so the remedy, the first remedy I would point to is court. I don't read the Mulaney case as saying that that's a routine practice. It seems to be a bit of an outlier. Is there any other authority for that proposition? Yes. The second authority I would point to, Court, too, is the Finn decision. And that's a case that went back and forth between the U.S. Supreme Court and the Fifth Circuit. And, in fact, it was remanded to deal with, in that case, a diversity problem. And diversity, we do believe, is relevant here because, among other reasons, the Schreiber case relied on Caterpillar, which is a diversity case. So, in Finn, you had a remand. And what was ultimately held by the Fifth Circuit is all you had to do was solve the diversity problem and then reinstate the original judgment. You didn't need to go through an entirely new trial. Now, we think even that step would be needlessly wasteful because we've already had a trial. Remind me in Finn what happened. They dismissed the non-diverse party? That's right. So, in the original trial, there had been a trial verdict. There was a diversity problem. It went up to the U.S. Supreme Court, went back down, and what happened was the – well, it actually went back down to the district court. And the question was, once we solve the diversity problem, do we just reinstate the old original judgment without further ado, or do we have to conduct an entirely new trial? And the Fifth Circuit said, you reinstate the original judgment. You don't go through an entirely new trial. But I don't want to lose sight of the fact that that issue, if it's relevant at all here, it's relevant to the money judgment, not to the permanent injunction. Now, there is another issue on this score that I'd like to address, which is even if there is some sort of merger problem created by the final judgment, I didn't hear my adversary on the other side talk about when finality occurred with regard to the money judgment. And we've explained in our brief that there was finality as of December 2019, and keep in mind that the transfer occurred in January 2020. So, let me explain a little bit why there was finality as of December 2019. That is when the district court decided the post-verdict motions. And as of that time, we had rulings, whether by summary judgment or by the jury verdict, on all of the causes of action, all of the counterclaims, all of the affirmative defenses. We furthermore had a ruling by the district court. I'm sorry. And the time for appeal for filing the notice then would have run from then if, in fact, I guess a new notice would be required, right? Yes. So, this order occurred on December 16, 2019. And the order also addressed prejudgment interests. And, in fact, L'Oreal filed a notice of appeal because it was concerned that that might be construed as final. And, yes, it labeled its notice a protective notice, but there's nothing in the federal rules that talks about protective notices. It's something that parties occasionally do, but at a minimum, it suggests that L'Oreal itself recognized that there might be finality as of December, and it wanted to get its notice on file and not take that risk. Our position here is, yes, there was finality as of December 2019. The only issue was whether there was a separate judgment paper required by Federal Rule of Civil Procedure 58. But under Federal Rule of Appellate – sorry, Federal Rule of Civil Procedure 58, under Federal Rule of Appellate Procedure 4A7B, when a party files a notice of appeal, it waives the separate judgment paper requirement. And, therefore, the separate judgment paper that was entered ultimately in March 2020 was unnecessary and did not remove finality that was present as of December 2019. So that's another reason why this Court need not even address the Schreiber issue. The final point I would like to make – That point is new, isn't it? I don't recall that being in your brief. No, that is argued in our brief. It is? Excuse me. Excuse me, Your Honor. I should correct what I said. This issue, in the context of this appeal, was framed up in the motion papers on substitution and joinder. We did make that argument in our motion papers in that case. We also have made that argument in the – The other case? No, in this case, in the reply in support of our motion to join or substitute, which was filed after L'Oreal made its jurisdiction standing argument for the first time, we did make this finality point about December 2019. We have also – we and L'Oreal have both briefed this issue in the Money Judgment Appeal, which we attached to a recent opposition to L'Oreal's motion for leave to file a supplemental brief for the Court's convenience. So the issue has been timely raised by us. The final point I'd like to make on the standing question, and I say this with all respect – this is a post-trial decision by the Court that they covered all the issues that are before us today and applied to all the issues other than the injunction. Is that correct? Yes, it covered – well, it covered – the injunction had already been entered, the permanent injunction had already been entered, but what the December 16, 2019 order did was it resolved all pending issues in the case that related to not just the injunction but the money damages issues. By that, as well as prejudgment interest. And, in fact, when the parties ended up submitting their proposed separate judgment papers, there was no disagreement in terms – except for some linguistic issues about how the counterclaim should be described. There really was no difference in terms of prejudgment interest, post-judgment interest between the parties, which, again, underscores that there was finality as of that time. The final point I'd just briefly make is that the Schreiber decision is, in fact, dicta on the question of whether, in the case where the transfer occurs after the district court enters judgment, there is an irretrievable mootness. Footnote 6 of Schreiber explains that because – and I'll just read it – although we have grave doubts as to whether Schreiber is correct, in light of our disposition, it is unnecessary to address this argument about whether Rule 25C of the Federal Rules of Civil Procedure allows for substitution for the first time on appeal. We respectfully submit that that is dicta. This court, in its unpublished decision in total containment, which, granted, it's unpublished but held, that there could be substitution for the first time on appeal in that circumstance. The Fifth and Tenth Circuits in the Slade and SLE cases have similarly so held, and, therefore, that's the better view also because, whatever one thinks of Mulaney, there is an issue about whether we want to go through a meaningless exercise of a remand for further proceedings in the district court when it's really unnecessary and not supported by precedent. Does the district court have discretion under Rule 25 if there's a very late substitution, long after the transfer takes place, to say, no, I'm not going to allow that, you're too late? Are there cases about that? I'm not sure, Your Honor, whether there are cases about the discretion. It may be that, in a case of extreme delay, there might be some discretion. However, I think it's worth pointing out that Rule 25C does not impose a time limit. Similarly, in cases, among others, of the Unilog case in this court and the Fifth Circuit's decision in TOC, say that substitution is entirely permissive, which, again, suggests that there's no strict timeline. And, in any event, there was no long delay here. The transfer occurred in January 2020, and Olaflex explained that it would seek substitution in about March of 2020. So there was no lengthy delay here such that would justify a denial of such a motion. So that's our position on that question. Unless there are any further questions, I'm standing. I'd like to turn to the claim construction issue. And I'd like to start with, you know, when we look at the claim, and we think that when we look at the words in the mixture, those don't say when you weigh the maleic acid. They just don't. It could be construed either way. And so what this court has done in prior cases, as Judge Taranto pointed out, is to look at it from the standpoint of the skilled artisan. And in that context, we have not just the magistrate judge in the district court, but also the PTAB in a related proceeding, and that's at 16081 of the record, explaining that a skilled artisan would look at this and say, you weigh the maleic acid before you add it to the bleaching formulation. And we don't even need to take it from the skilled artisan standpoint alone. Can I just interrupt for a second? Did the parties agree at some point, either here or in the district court, that the question of timing of measurement had the same answer for the 419 and the 954? I'm not sure if there was an agreement on that question between the parties. There is. Let me try to answer the question a different way, though. It is true that the 419 patent, I think it's important to clarify, talks about maleic acid or salts of maleic acid. That's right. Right. What the parties agree on, I believe, is that once you combine the active agent formulation with the bleaching formulation, there will be no non-ionic maleic acid left. It will all have been neutralized. So at most, you will have some salts. And in the 419 patent context, the problem with that is it eliminates non-ionic maleic acid, which is claimed by the patent as an option because it says it's maleic acid or salts. It eliminates one of those options. And in the 954 patent, it's even an easier question because that doesn't talk about salts at all. It only talks about maleic acid. Do you have any better recollection than you had 60 seconds ago about whether there was an agreement or, to put it the other way, did L'Oreal ever argue that the timing of measurement question might be resolved differently for the 954 and 419? Well, I honestly don't. You have a stronger argument, I think, on the 954 than you do on the 419 because in the 954, that view would seem to wipe out, I mean, make meaningless some aspect of maybe even the whole claim. But with the salts in there on the 419, not so much. Right. And because we had prevailed, because Olaflex had prevailed on claim construction, we did not attempt for infringement purposes to point to salts because we thought all we needed to do was point to maleic acid as it existed before being added. But let me just briefly move past that question because I think it's also very important, when we talk about how a skilled artisan would look at this, to look at how L'Oreal's own skilled artisans look at this. And I'd refer the court to 47631 of the appendix, which is an opinion by L'Oreal's expert, Nanda Giri, in a PTAB proceeding where he uses the words in the mixture the same exact way that Olaflex uses, which is that it points to a pre-mixture weight. And even in the companion appeal that this court was dealing with today... That evidence arose after the summary judgment, correct? Well, I think we're still on claim construction, and I'm not entirely sure when that PTAB expert report was filed, but I still would submit that it's relevant evidence of what a skilled artisan would look to. And in L'Oreal's own brief in the companion appeal at 16 to 17, L'Oreal also... That sounds like a fact question as to how an artisan would interpret this, and I don't know how to bring in factual evidence that postdated the claim construction and the summary judgment. I mean, it's not intrinsic evidence we're talking about here. Well, I believe that this court, where there's an ambiguity on a claim, can consider extrinsic evidence, and I want to just correct briefly what I said. No, I'm not saying that at all, Your Honor. In the district court's claim construction decision, it refers back to the PTAB. It relies on the PTAB for persuasive authority, so that it was decided by the PTAB before the district court's claim construction. This is at 16-081-082 of the record in this case. And the PTAB, in turn, explained that skilled artisans, including L'Oreal's own experts, had used in the mixture the same way that Olaplex has used it. And just to nail this down, is the L'Oreal expert statement that you started talking about the statement that the board relied on in the board decision that you were just referring to? I believe it is, but I'm not 100%—in all candor, I'm not 100% sure of that. But there are various—if not, there are other similar statements that the PTAB did rely on. This is not an outlier. The Nandagiri opinion is not an outlier. It's similar to numerous other opinions. Your own expert did say this, right, and that the magistrate— Absolutely. —and the district judge adopted. Absolutely. Our expert's position was clearly that you weighed it before even adding it into the aqueous solution that's the active agent formulation. If I could move on to the summary judgment issues, let me start with the question of the NMR. And I think it's very important that before one even gets to NMR, to recognize that there's an alternative way to finding that there's infringement of the malic acid concentrations, which is from L'Oreal's own documents. L'Oreal's own documents in that respect say that it's less than a certain amount, right? What they say—yes, Your Honor, what they say is less than or equal. And let me— Wait. How is a statement that it's less than X prove that it's X? Sure. In two ways. Number one is that L'Oreal never argued the less than or equal issue below. It was argued for the first time in their reply brief on appeal. That explains why it's not addressed at length below. But let me answer it on the merits. Dr. Borish, which is L'Oreal's expert at 27714, relied not just on the less than or equal 10.7% document, but also on L'Oreal chemist Dreher's estimate that the malic acid concentration was 33% of 35.67%, which is 11.7%, which puts the number, in fact, over 10.7% as opposed to under. With that, no reasonable juror could find that it was something like zero. In fact, it was somewhere between 10.7% to 11.7%, which is within the range, once you use the instructions that are provided in L'Oreal's documents about how to combine it with bleaching formulation. And so Borish relied not just on NMR testing, but also on those documents. Now, Judge Toronto, we agree with your point about the relative molecular weights. What we're talking about, first of all, the claim construction starts with the pure malic acid before it even enters aqueous solution. And, yes, Dr. Borish had the test done on the aqueous solution product. But it's able to pick up non-ionic malic acid as well as maliate and hydrogen maliate. And the only molecular weight difference between hydrogen maliate and malic acid is the loss of one or two hydrogen protons, which have a negligible weight and, therefore, would not affect in any meaningful way the weight concentration. I'm not certain I understand this fully. I thought I heard Mr. Kinnaird say, but not quite in a way I could follow, something to the effect that some of the maliate found in the bottle, in the ultimate mixture, might not have come from the maliac acid that was in the aqueous solution. There might be other predecessors of maliate. Did I understand that right, and can you illuminate that? I'm not sure if he was making that assertion or not, but I don't know where else it would have come from. And I am not the chemist or the expert here, but Dr. Borish explained using the district court's claim construction, which, again, looks at the maliac acid in its pure form before it's even added into that aqueous solution, that that would be the sole origin of any maliac acid-originated molecules in that solution. Was he relying on the molecular weight point or not? He was relying on, yes, because nuclear magnetic resonance imaging is, by its nature, a weighing of all of those molecules. I don't recall him discussing the point that Judge Toronto raised. Can you show me where he addressed that? He did not say what the weight of a hydrogen proton was, but he did say that nuclear magnetic resonance weight testing would measure all three of those molecules. And it's a matter of scientific fact that a hydrogen proton has a negligible weight compared to maliate or hydrogen maliate. I worry about finding scientific facts on appeal. I understand that concern, but I think, again, I would go back to the documents. That is an entirely separate approach than NMR here, which also point to infringement of the weight concentrations. Can I ask you just to pursue this one further minute? When, in the district court, L'Oreal registered some criticism of the NMR analysis, is that right? Yes, that's correct. And when it said that the NMR analysis picks up the maliates and not just the maliac acid, I assume it did say that would make a difference in the numbers. Did it ever say that would make a big enough difference in the numbers that it would alter the only conclusion that mattered, which was that the accused products were within the claimed range? I don't believe they took that further step, nor could they have given the negligible weight of a hydrogen proton. Okay. Let me turn to the step three attribution point briefly, and I have just two quick points on that. Number one is... I'm sorry. Before you get to that, can you address this business about there are two points that are made by L'Oreal about the bleaching formulation, which applies to both of the patents and the bleaching powder or bleach powder that applies only to the 954? Can you address L'Oreal's argument about why the evidence doesn't show that, at least doesn't show it enough to entitle you to summary judgment on the point? Sure. I would point the court again, as with the issue I was just discussing, to L'Oreal's own documents, and specifically, for example, Appendix 31261 and 615, which is L'Oreal's marketing of its active agent products for use with L'Oreal's own bleach products. We know from the record, and I just gave the sites, that L'Oreal's own bleach products include, as their very first ingredient, potassium persulfate. Bleach powder was construed as an alkaline composition that includes a persulfate. So we have from L'Oreal's own… Wait, wait. These kits don't require the use of that product, right? The alleged infringing kits. No. They don't require it, but again, if we look at what L'Oreal actually did with the products in its own live demonstrations, it said, when we do these demonstrations, we ourselves are using our active agents with our bleaches. And so, for example, 30396 is the Redken active agent with the Redken bleaches, 30413 and 31264 is the Smart Bond, and 31261 is the Matrix Ultimate. All three lines of products, L'Oreal itself, and this goes, again, I haven't gotten to it yet, but direct versus induced infringement. We don't even need to get to induced infringement to support a permanent injunction here, because we have indisputable evidence from L'Oreal's own witnesses, Marino, Morris, and Chirabi, that their demonstrators are out in the field doing these steps every day using their own active agents and their own bleaches, and we know from the labels that their own bleaches include persulfate as the very first ingredient. L'Oreal's argument to the contrary ignores these documents from their own files. Are you saying that it should be an injunction that is limited to enjoining them from these demonstrations? Among other things, it should enjoin them as it's currently phrased from promoting or using. How does that, even if it's true, support the breadth of this injunction? Because the injunction as it's currently phrased, as this court has phrased it in the interim orders, bars promotion or use of the step one, step two, three, and three ingredients in an infringing manner. So when they're doing these demonstrations, they are both using as well as promoting the use. But if this court wants further evidence beyond just what L'Oreal's own people were doing, there is the Laris Declaration 33250 of the appendix, which is a person who's a stylist who's not a L'Oreal employee, who testified that she used all three steps of all of L'Oreal's product lines with red king bleach, which is one of the L'Oreal bleaches that includes potassium persulfate as its first ingredient. So we have testimony not just that L'Oreal itself did all this, but that it was promoting it to at least one person. And I disagree with my opponent on the other side. One instance is enough. We have many more than one instance, but one instance is enough for a permanent injunction. The extent under Lucent is a question for damages, not a question for the permanent injunction. And we have done enough. And L'Oreal's arguments in the main ignore its own documents. Can I just ask this? I mean, why wouldn't the extent be relevant to at least the weighing of harms that would be required for the injunction standard? That is, if the injunction prohibited L'Oreal from doing a very wide range of things, one of which, not a wide range of things, but, yeah, a wide range of things covering many, many, many people's activities, their various customers' file list activities, and we only know that in some very narrow subclass, those activities would actually infringe, then doesn't the balance of equity shift rather a lot? I don't believe so. And I think we have to keep in mind also the factor that L'Oreal, based on the summary judgment, is an infringer. Based on the jury verdict, is a willful infringer. We also have to keep in mind that this is the entirety of Olaplex's business, whereas it's a very minor part of L'Oreal's business. L'Oreal is one of the biggest beauty and cosmetics companies in the world. And in terms of irreparable harm, we have shown enough, not just from L'Oreal's own actions, but from Laris, who's a non-L'Oreal stylist, plus the instructions, which, yes, they mention coloring, but they start, before they mention coloring, they talk about lightening. And when you put all of that together, maybe the extent of how many Larises are out there is an open question. We think that that was decided by the jury, and we'll get to that in the next case. But we have enough for an injunction. It shouldn't be allowed for an adjudicated infringer to be promoting the infringing use of these products, even to a single person. And so I'm not sure why. What you're saying is even if L'Oreal is right about induced infringement, you're saying the injunction can be sustained because of these small number of alleged direct infringements by L'Oreal? Well, respectfully, it's not just alleged. It's testimony from their own witnesses that they did actually use these products with their own bleaches. But, yes, I would say that that evidence alone would support the injunction, because that is a use and a promotion of the use, which is what the injunction prescribes, of an infringing process. Okay, well, let's suppose hypothetically that we don't accept that. Why isn't there a jury question on induced infringement? I think that there may be a jury question on the extent of induced infringement. That was decided by the jury. What I'm suggesting to the court is that that is not necessary to sustain the permanent injunction here, given the indisputed evidence we have of infringement, whether direct or indirect. And I do think L'Oreal instructed that liability had been established, including liability for induced infringement. No. The jury still had to evaluate the extent of that. Am I correct? I'm correct that they were instructed that way, right? I believe they were. I don't have the instructions open right now, but I believe that they were. But what the jury was instructed or found, again, I respectfully submit, is not necessary to sustain the permanent injunction here, because of, among other things, the direct evidence, as well as the Laris Declaration. There was an argument by counsel that the Laris Declaration is completely incredible, but that is not a basis to deny summary judgment simply because a party asserts that something is incredible. In terms of the date of the declaration, it was signed on April 3rd, 2019. It speaks in the present and recent past tense, so there's no reason to think or infer, and no reasonable juror could infer, that she used the products only before the patents issued in 2016. In terms of the late disclosure, alleged late disclosure of the Laris Declaration, it was within the district court's discretion under Third Circuit case law. I'd cite the Viverka case, 649S Appendix 165 to 166. It says the district court has discretion in terms of accepting a late disclosure witness in those circumstances. The final point I want to make is, even if this court has concerns about the Step 3 products, and we don't think that the court should have concerns, the Step 3 products, by their nature, are called Step 3. They necessarily refer back, and their instructions refer back to Steps 1 and 2. So the Step 3, whether or not it itself infringes, is again promoting an infringing use of Steps 1 and 2. And for that reason, among others, the injunction can be sustained and should be sustained as to Step 3. Can I ask you something? I do have one further question. Can you say something about this Akamai aspect, where at least the allegations that involve the customer's use seem to require that a stylist and a customer be equated for direct infringement purposes? And why was the evidence sufficient for summary judgment in your favor on that question? Sure. Thanks, Judge Ferranto. The first preliminary point I would make is that Laris, in her declaration, testified that she herself did all three steps, including Step 3. So we do have an example where we don't need to attribute a customer to a stylist. We have the stylist performing all three steps. Beyond that, on the Travel Sentry point, vis-à-vis the Akamai en banc decision, we do think Travel Sentry interprets those conditions of attribution in a way that applies here. And the reason is because Travel Sentry doesn't impose some strict requirement that will cut off access to the process by the first actor if the second actor doesn't do exactly what he or she was instructed to do. It's more lenient, and what it does is it focuses on the benefits. So if there are instructions from the first actor to the second actor, and if there are benefits that are reasonably obtained by performing those instructions, that is enough under Travel Sentry. Under Travel Sentry, who is it that is required to benefit? Is it here, the home user, or is it the stylist? It would be the home user. And in Travel Sentry, similarly by analogy, it was the TSA, Transportation Safety Agency, that was the actual performer of the steps. And in your summary judgment papers, did you address all of this? This whole Akamai attribution question for the direct infringement that's relevant here? I think it's actually to the induced infringement point. Well, but it's relevant indirectly because without direct infringement, there's no induced infringement. That's right. You need direct infringement by some end user, and you need some end user or attributed end user to have performed all the steps. And I believe this was briefed. I'd be happy to provide the court with a specific page reference by letter, but I don't have that at my fingertips. All right. Unless there are further questions from my colleagues, I think we're out of time. Thank you. Hearing no questions, we'll hear from Mr. Pinard in just a minute. Yes, Your Honor. I'll be very fast. So on the standing, I would note that Mulaney is a Rule 21 case. They still identify no authority that you use Rule 21 to cure muteness or to substitute a party, which is what they would have to prove. In Mulaney, it was perfecting the jurisdiction over for the injured party, which were the union members. On the point about whether the members... Thank you, Mulaney, in my head here. I thought that your friend on the other side said, and I think this was Mulaney he was discussing, maybe another case, that the Supreme Court added the party specifically saying it was doing so so it didn't have to decide whether the pre-added party had standing, which means that what it did must be authorized even on the assumption that the original party lacked standing. No, Your Honor. I think this falls in the line, as the Ninth Circuit said in Bain, where you're perfecting the jurisdiction by adding a party, but there's an Article III controversy. So the court did not decide that the union lacked associational standing on behalf of its non-resident members? But did it say we don't have to decide that so that what we are doing is a valid thing to do even if that union association did not have standing? It must have been saying that, right, if it wasn't decided? Well, what it said is that it would perfect the appeal, but it's different when it's clear that the current parties have no standing. Case is moot, so you have to substitute. This is not an addition. I would also point out, and I would urge the court to look at the December 16th order in paragraph 11, because the district court clearly says he's ordering them to submit a proposed final judgment, and he asked the proposed final judgment to reconcile that memorandum, the court's memorandum on the duplicative damages and the jury verdict. And so that, and then he says, I will then enter a judgment. This is not a matter of just this separate paper requirement. And it's true the parties agreed on the prejudgment interest starting with the latest of the jury verdicts, but the point is the court hadn't held that. The court was reserving to itself to review what the parties came up with, and the parties did dispute the disposition of other orders. And so on the dicta point, the only dicta is Rule 25. Rule 25 cannot be invoked when there's no Article III standing. I would then move on. Mr. Cairns, before you run out of time here, could you address the question of whether the injunction can be supported on the direct infringement theory that we heard from Mr. Weisburst? In other words, the way I hear him, he seems close to admitting that there might be genuine issues of material fact with respect to inducement. But he says, nonetheless, there are instances here of direct infringement by L'Oreal itself, which could support the injunction. Your Honor, I would say the answer to that is no, but I would just point out on their training videos, they never established that the performance took place before the patents issued. And on the educators that go out, they never showed that all it says is that you're going to demonstrate the use, and one opponent thought that could mean just show how to mix it. They didn't show an actual example of a single action. But the judgment cannot stand without the indirect infringement because of Step 3, and there's no allegation or proof of any direct infringement of Step 3. And I would point out, they cannot say that the Laris – first of all, on Laris, there is no evidence, they point to, that we induce her use of Step 3 in the salon. They didn't put any evidence of inducement at all. If they're relying on the instructions, those are only for at-home use. There is no evidence of inducement. But I would also push back on the idea that one instance of direct infringement, indirect infringement across the board. If they had sued 10 different stylists, they couldn't prove summary judgment on all 10 just based on this Laris. So that's part of their liability case, and liability for each inducing act is not important if you have reasonable royalties, but when you're seeking lost profits, it is critical. And then, you know, as far as the issue of control, we think that summary judgment, they certainly don't get summary judgment on controls. Mr. Kinnaird, this is Jeff Turner. Can I ask you this question? And I know it's sort of getting ahead of ourselves. Suppose that at the end of the day in the case we're about to hear, the TGR case, and suppose also in the appeal of the December remand ruling in the 419 TGR, that the breakage claims and only the breakage claims survive. What should happen in this case? The breakage claims are critical to the summary judgment. If you uphold everything else, the breakage alone would not prevent an injunction. But you would have to uphold the Step 3 issue on indirect for all those claims, which includes the breakage claims, and you would have to uphold the independent claims as well. I would just point out one issue on the malic acid safety sheets. That's a red herring because the malic acid there is the same, measuring the same weight as the NMR. He did not rely on it, perhaps because it was a maximum. But the point is it suffers from the same flaws. The issue is that what you use the molecular weights for is to determine the fractional composition of that weight that is free acid. That's what Dr. Freeman said. He said, hey, you can't use this as a proxy for the amount added into the formulation, which is a different amount of free acid, because even this is for the concentration. So they had to go back to the original aqueous solution, the Step 1 product, and show that the free acid there under their own construction would be within the concentration ranges. Thank you. I think unless my colleagues have further questions, we're out of time. Thank you, Your Honor. Thank you. I thank both counsel. The case is submitted.